# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 13, 2010 Session

## STATE OF TENNESSEE v. MICHAEL HILLIARD

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 03-01956, 07-09177    James M. Lammey, Jr., Judge**

---

**No. W2008-02813-CCA-R3-CD   -   Filed November 1, 2010**

---

The defendant, Michael Hilliard, was indicted on March 25, 2003, for first degree premeditated murder, felony murder, attempted first degree murder, and especially aggravated robbery. The defendant was tried on the charges in June 2007, with the State seeking the death penalty. However, a mistrial was declared after the jury was unable to reach verdicts on the charges. In December 2007, the defendant was indicted for especially aggravated robbery, allegedly occurring during the 2002 episode in which the victim was shot and the defendant was charged with attempted first degree murder. The defendant then was tried upon the indictment returned in 2003, as well as that returned in 2007, and found guilty of two counts of criminally negligent homicide which were merged, one count of misdemeanor reckless endangerment, and two counts of aggravated robbery. He was sentenced to an effective sentence of seventeen years, eleven months, twenty-nine days. On appeal, he argues both that the trial court erred in not dismissing the 2007 indictment for especially aggravated robbery because it was not returned with the 2003 indictment and in concluding that he could not present evidence of the guilt of a third party. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Claiborne H. Ferguson (on appeal and at trial) and Robert Harford (at trial), Memphis, Tennessee, for the appellant, Michael Hilliard.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

# FACTS

### State's Proof

Testifying though an interpreter, Hussein Altilibwy, the victim in the 2003 indictment for attempted first degree murder and the 2007 indictment for especially aggravated robbery, said that, on September 16, 2002,[1] he was at home with his friend, Kadhem Al-Mailey, whom he called "Uncle." Parked in the driveway of the residence were Al-Mailey's 1994 Chevrolet Caprice and the victim's Jeep Grand Cherokee. At approximately 2:30 a.m. the following morning, the victim went outside to check on the cars in the driveway. He encountered a man with whom he was acquainted, nicknamed "Boo," and later identified as Devin Banks, who pointed a gun at his head. As the victim turned toward Banks, he was shot three times. After being shot, the victim fell and saw another individual, who later was identified as the defendant, standing at the corner of the house. He said that he saw Banks come from the house, carrying car keys and money, and hand the keys to the defendant. The victim said that he had approximately $8500 in cash in the house. Banks got into the Jeep and drove away, while the defendant did the same with the Caprice. The victim went into the house and called an acquaintance, who was a truck driver on his way to Michigan, and asked for help. The victim said that "Mohammed" came to help him, and the police arrived shortly thereafter. The victim told the police that Banks had shot him.

The victim acknowledged that he testified at the 2002 preliminary hearing that he thought the man standing at the corner of the house was white, but he said he did not "think what [he] was saying was credible because [he] was under some narcotic, and the name of the medicine was mentioned."

The prior sworn testimony of Mohammad Al-Burkat was read into the record. In that testimony, the witness said that he was then living in Florida and working as a driver for a concrete company. He said that, on September 16, 2002, he was living in Germantown, Tennessee, and received a telephone call from Amad who told him that Altilibwy had been "robbed and beaten and shot." The witness and his girlfriend, Sherona Buford, went to Altilibwy's residence, saw traces of blood in the driveway, and heard Altilibwy "seeking help." He saw no vehicles at the residence, but in the past he had seen a Chevrolet Caprice, a Jeep Grand Cherokee, a Ford Mustang, and a pickup truck. He said that "blood [was] covering [Altilibwy's] entire face – covering the entire path; and there was so much blood on the floor to the point that [he] avoided to step on it."

---

[1]Apparently, the witness meant to say September 15, 2002.

Officer Patricia Kay Turnmire of the Memphis Police Department testified that she and her partner processed the crime scene; took photographs; collected evidence, including a .22 caliber bullet casing; and prepared sketches, which were made exhibits during her testimony.

Dr. O.C. Smith, a forensic pathologist, testified that the victim, Kadhem Al-Mailey, died as the result of a single near gunshot wound to the right back-side of the head. He said that, based upon the bullet fragments removed from the victim, he believed they were from a "small somewhere in the realm of a .22 to a .25 caliber bullet."

Read into the record was the testimony from the defendant's first trial of Kevin Shaver, who was a Memphis Police Department crime scene officer and had been involved in the processing of a white Ford Explorer and a red Jeep Cherokee. Inside the Explorer was "an automatic – kind of like an L-shaped gun." Officer Shaver was dispatched to 3372 Buchanan where officers found a small caliber gun with a magazine and bullets that went with a .25 or .22 automatic gun.

Officer Steve Jones of the Memphis Police Department testified that he responded to a shots fired call at 1191 North Graham on September 16, 2002, at 6:53 a.m. He said he and his partner noticed "a bunch of blood on the sidewalk" as they approached the house. Inside the house, they discovered the deceased victim who was lying facedown in a puddle of blood with a gunshot wound to the head in a bedroom and the surviving victim sitting on the couch covered with blood. The surviving victim, who spoke in broken English, gave the officers one of the suspect's names. Officer Jones said they learned the name of the shooter from a woman across the street. He said that Devin Banks, who was known as "Boo," was taken into custody about two and a half hours later when he was stopped while driving the victim's red Jeep Cherokee. Officer Jones said that Banks had blood on his feet at the time.

Officer Gerald Paige of the Memphis Police Department testified that he was dispatched to Altilibwy's residence on September 22, 2002, to recover a bullet casing. He said that a .22 caliber spent casing was found under a bed in the southeast bedroom.

Officer Eric Hutchison of the Memphis Police Department testified that on September 16, 2002, he recovered the Chevrolet Caprice in front of 1023 Tupelo, No. 10, in the Tupelo Manor Apartments. He said that the apartment was about four or five miles from Altilibwy's residence.

Lieutenant Mark Miller of the Memphis Police Department testified that he went to the Regional Medical Center where Altilibwy was in critical condition being prepared for surgery. He spoke briefly with Altilibwy who told him that "Boo" had come to his house,

asking to use the telephone. Altilibwy said that after he allowed "Boo" to use the telephone, "Boo" shot him. Lieutenant Miller then went to the victim's residence on North Graham. He said that "Boo" was identified as Devin Banks and that investigating officers had received information that Banks might be in a red Jeep Cherokee in a nearby neighborhood. Lieutenant Miller subsequently stopped a red Jeep Cherokee being driven by Banks. Banks had over $1200 cash and appeared to have gone on a shopping spree.

Lieutenant Miller said that he took a statement from Banks who confessed to his part in the murder and named Brian Winters as the other person who was there with him. Banks gave Lieutenant Miller the names of several people who were allegedly involved in the crimes with him, but the defendant was not one of them. Winters told Lieutenant Miller that he had been home with his girlfriend and that the defendant had been there also. Miller then called Winters' girlfriend and the defendant, both of whom said that Winters had been at home on the night of the shooting. The defendant told Lieutenant Miller that he had talked to Banks late that night and that he thought John Tomason was with Banks when he talked to him.

Lieutenant Miller said that the defendant voluntarily agreed to come to the police station to give a statement. He said at that time the defendant was a witness, not a suspect. When the defendant arrived at the police station, he gave Miller the owner's manual for a .22 automatic firearm that he owned. During Miller's conversation with the defendant, the defendant "implicated that he was involved in the robbery/homicide" and was advised of his rights. Lieutenant Miller then took his written statement.

Dr. Michael S. Muhlbaeur, a neurosurgeon, testified that Altilibwy had a gunshot wound to the right temporal area of the head and was semi-comatose when he arrived at the Regional Medical Center. Dr. Muhlbaeur performed a right-sided temporal lobectomy on Altilibwy and recovered a bullet fragment. Explaining the post-operative effects of the victim's injury, Dr. Muhlbaeur said that he would expect Altilibwy to have problems with cognition, memory, speech, and gait.

Agent Steve Scott of the Tennessee Bureau of Investigation ("TBI"), assigned to the firearms identification unit, testified that he examined a Bryco Arms .22 caliber pistol, two .22 caliber fired bullets, and two fired cartridge cases that were submitted in this case. He determined that the bullet recovered from the deceased victim's head had been fired through the barrel of the .22 caliber pistol and that the two cartridge cases had been fired in the pistol as well.

James Fitzpatrick testified that, in 2008, he retired as a sergeant with the homicide division of the Memphis Police Department. He said that he was one of the first officers to

arrive at the victim's residence after the shooting and acted as the scene coordinator. He examined the surrounding area and the house and described the photographs taken and the evidence collected. He said that, in Devin Banks's sport utility vehicle ("SUV"), he found a .25 caliber Titan Arms automatic pistol.

Sergeant Fitzpatrick read to the jury the defendant's statement:

"On September 16, 2002, Kadhem Al-Mailey was shot and killed at 1191 North Graham. Are you the person responsible for his death?"

"No."

"Do you know who is responsible for his death?"

"Yes, Boo."

"Do you know Boo's real name?"

"No."

"How long had you known Boo?"

"About six months."

"Is Boo the same person that you identified from the photo that you were shown when you gave a statement earlier?"

"Yes."

"Is Boo the same person responsible for shooting Hussein Altilibwy?"

"Yes."

"Did you and Boo plan to shoot Kadhem Al-Mailey and Hussein Altilibwy?"

"Yes. We planned to get Hussein. The other guy was just there. Boo said that Hussein stayed there by himself."

"Did you know Hussein Altilibwy or Kadhem Al-Mailey before you

-5-

went to their home?"

"No.  I never met them."

"When did you make these plans?"

"About three weeks ago."

"What was discussed when you made these plans?"

"That Boo would go in the house, and me and Danny would just watch out."

"Where – well, were you present when Hussein and Kadhem was shot?"

"I was around the corner when Hussein got shot outside, and I was in the front room when the other guy got shot."

"How many shots did you hear when you were in the front room in the house?"

"One.  But when I was outside, I heard about five or six shots outside."

"When you were outside and heard these shots, did you know that Boo had shot Hussein or Kadhem?"

"Yes, because he said he was going to shot [sic] Hussein."

"Where did Boo get the gun from that he used during the shooting?"

"He got the gun from me."

"What type of gun did you give Boo?"

"It was a .22; I got it from Triple A Pawn Shop on Austin Peay.  I had it for about three – about a week."

"What were the events . . . that led to the shooting of Hussein Altilibwy and Kadhem Al-Mailey?"

"Three weeks, Boo told us that we should get Hussein, and he was telling us about the money he had and the title to all the cars he have and said, 'We need to get him.'

"So, Daniel was all psyched up in doing it, but I was like, 'It don't matter.'

"Boo was talking about how to get rid of the body and stuff. One way we was talking about getting rid of the body, Boo was supposed to have been killing Hussein and taking the body to the river while me and Daniel watch out; but we never did anything, so I was like, 'He's just playing – he just kidding.'

"Then Sunday, September 15th, Boo called me when I got off work at 4:30 and told me to come over and help out on his truck. I said, 'Yes,' and came over after I got off work. He needed a patch for his back left tire, so we took him to O'Reilly's Auto to get a patch; but they were closed about 6:30 or 7:00, so we took him back to the house, and we was just talking.

"Boo's friend John pulled out a .25, and Boo said, 'This is what I'm going to use. I need some bullets for it. So, I told him to, 'Come over to my house, and I may have some for you.'

"Boo came over to the house about 9:00, and the bullets didn't fit his gun, so he asked could he borrow mine. So I said, 'Yes.'

"Then at 12:00 he called me at O'Boy's house and said, 'I'm fixin' to take care of that.' So, I put on my clothes and went over to Hussein's house and waited around the corner to be called there – until I heard something. Then I heard a couple of shots, so I started walking toward the front of Hussein's house, and that's when I seen Hussein's body on the ground by the truck.

"Boo told me to pull the body to the back. I went to pull the body to the back, but Hussein started moving, so I said, 'Boo, he is still alive.'

"Boo told me to come in the house and look for the money. So, I went in the house and started looking for the money.

"Then Boo shot the other guy, and I started looking for the keys to the

-7-

car. I started putting the speakers and the clothes in the truck. Right before we left, Boo gave me the gun, and I put the gun in my pocket. Then we left, and I trailed him to Hussein's shop close to Amoco where Hussein's truck was at. I told Boo, 'Let's put his car up and come back and get the truck,' so he said the truck was close to being out of gas, so he went up to Amoco to fill up.

"I gave him directions to Tupelo Apartments so he could pick me up once he was finished filling up.

"We left Tupelo Apartments and headed to my house, and when we made it to my house, I got one shirt and hat and went in the house."

"Did you agree to dump Hussein's body in the Wolf River?"

"Yes."

"Did you and Boo attempt to determine when Hussein would be at home?"

"No. Boo, he was supposed to call me and go over and handle that."

"When you say Boo was going to handle that, what do you mean?"

"I say killing him."

"Who were you talking about when you say killing him?"

"Boo was supposed to be killing Hussein."

"How long was Boo at Hussein's house before he called you?"

"I guess as soon as he walked in the door."

"How long were you inside the house?"

"About fifteen to twenty minutes."

"While you were inside the house looking for money, did you see anyone else inside the house?"

"I saw the other guy in the bedroom on his stomach with a pillow over his head[.]"

"Was Kadhem Al-Mailey alive when you went into the bedroom?"

"No."

"At what point did you know that Kadhem Al-Mailey was not alive?"

"When I heard the shot in the house."

"Where were you standing when you heard the shot inside the house?"

"In the front room by the TV looking for the keys to the truck and the car."

"Which car and which truck were you looking for the keys to?"

"Cherokee and the Caprice."

"Where were these cars located when you were looking for the keys?"

"In the driveway."

"How did you leave 1191 North Graham?"

"I drove the Caprice."

"How did Boo leave 1191 North Graham?"

"In the Cherokee."

"Where is the shop located that you trailed Boo to?"

"It's off of National."

"When Boo dropped you off at home, you indicated that you took a shirt and a hat from the Jeep Cherokee. Where are these items now?"

"On the top of my clothes in my bedroom between the entertainment

system and the window in the corner."

"Describe the shirt and hat that you took from the Jeep Cherokee."

"It was a blue button-down shirt with a matching hat to go with it."

"Did you get any money from 1191 North Graham or from Boo?"

"Yes.  I got $150."

"Where did this $150 come from?"

"Boo said he found $300 in the house."

"Did you or Boo find any money at 1191 North Graham?"

"No."

Sergeant Fitzpatrick explained how a statement he took from the defendant differed from the statement the defendant earlier had given:

Well, he changed some things.  He admitted that it had been his weapon – that he had given the weapon to Devin Banks; that he was aware of what it was to be used for.  He indicated that he had not been there when [Altilibwy] was shot; that he came around the corner a short while later and was asked to drag the body to the front of the . . . jeep; but when he attempted to do so, [Altilibwy] moved.  He . . . gave Devin Banks this information; and then he was told to accompany Devin Banks into the house to look for the money because money had been discussed; that he had a shoe box full of money.  So they were – he was to go in and attempt to look for the money inside the . . . house.  He did.  He looked for the money.  He indicated that he was in the livingroom [sic] at the time that Mr. Al-Mailey was shot and that he later went into that room, stepped over Mr. Al-Mailey, looked into the closet, and I believe he said that he removed the big speaker from inside there and some clothes – well he said that he moved these items and put them into the truck.  I don't think he moved them from the bedroom where they were.  I think Devin Banks moved them from there, and he put them into the red Jeep.

He was given his gun back there at the scene.  He put it in his pocket.  He left there driving the Caprice and suggested that it be dropped over on

-10-

Tupelo in some apartments. Before . . . they did so, they had to fill up the Jeep Cherokee at a service station near the business that [Altilibwy] owned, and then they drove over to the . . . apartments on Tupelo – dropped the Caprice and then rode – and then he was dropped back off . . . on Buchanan. He said he got a shirt and a hat out of the Jeep and then went into the house. He placed the .25 under his pillow once he got there.

    . . . .

I'm sorry .22 caliber is what . . . he owned. He got his .22 caliber back there at the scene, and then he put the .22 caliber under his pillow once he got back to the Buchanan address.

He said that the defendant never mentioned that he had a alibi for the time of the crimes. The defendant signed a consent form allowing the police to search the residence where he was living at 3372 Buchanan.

**Defense Proof**

The prior sworn testimony of Sherry Tomason was read into the record. In that testimony, Ms. Tomason said that her son, John, was friends with Devin Banks. She saw Banks around 11:15 p.m. on September 15, 2002, when he brought her son home. She said that Banks' vehicle, a white SUV, had a flat tire, so she allowed him to leave it in her yard. Banks then left, walking toward Leewood Church and saying that he was going to meet his brother. Shortly thereafter, Banks and his brother, Myron, walked back by Ms. Tomason's house while she was sitting on the porch. She offered to give the brothers a ride, but they declined, saying that the man from whom they had bought the car lived around the corner. She did not see Banks again until about 7:15 a.m. the next morning when he came to her house in a red Jeep Cherokee and offered her children a ride to school. John Tomason left with Banks in the Jeep Cherokee. Banks returned to Tomason's house a short time later, saying he needed to get a CD out of his white SUV. A white male was with Banks at that time.

George Jones testified that he had known the defendant for about eleven years. He said that on September 15, 2002, the defendant called him and asked if he would take one of the defendant's friends to get a patch for a tire. He picked up the defendant and his friend, a white male, and took them to O'Reilly's, but the store was closed. He then "dropped off" the defendant's friend and took the defendant either home or to the defendant's girlfriend's house.

Karla Cleaves testified that in 2002 she was engaged to the defendant. She said that the defendant came to her house on the evening of September 15, 2002, and stayed until approximately 2:00 a.m. the next morning when he left with a friend, Alphonso Parrish.

Alphonso Parrish testified that he and the defendant worked together in September 2002 and that the defendant worked from 10:00 a.m. until 4:00 p.m. on September 15, 2002. Parrish said that he left work at approximately 1:00 a.m. and went to pick up the defendant at Karla Cleaves's house. After taking another co-worker home, he took the defendant to "Brian's" house on Buchanan Street where they all sat outside talking for about an hour. Parrish said that the defendant went inside the house between 3:30 and 3:45 a.m. Parrish said that he then went home and that he next saw the defendant at 10:00 a.m. when he reported to work.

The twenty-eight-year-old defendant testified that in September 2002 he was working at Rally's and that Alphonso Parrish was one of the managers. At that time, he was living in a house owned by "Country" whose boyfriend was Brian Winters. He had two automobiles, a 1995 Hyundai Elantra and a 1992 Ford Mustang. He acknowledged that he knew "Boo" but denied knowing the victims. He admitted buying a .22 caliber pistol at the Triple A Pawn Shop but denied loaning it to anyone. The defendant said that he did not realize his gun was missing until "Country" told him that an officer had come to pick it up.

The defendant said that he told the police that he and Jones went to help "Boo" and John Tomason repair a tire, but the store was closed. He said that he told Sergeant Miller that he was at Karla Cleaves's house at the time of the crimes and called Cleaves and let Miller speak to her. He had the paperwork for his gun in his wallet and gave it to Sergeant Miller because he wanted his gun back. He told the officers that he had nothing to do with the crimes, but they kept insisting that he was involved.

The defendant acknowledged that in his first statement he told the officers that he gave his gun to "Boo," that "Boo" called him from the telephone in Altilibwy's house and told him that he had shot the victims, and that he went to Altilibwy's house where he "took a car and some stuff." He acknowledged that in his second statement, he admitted taking some clothes and speakers from Altilibwy's house. However, he denied that anything had been taken, saying that the police told him that was what they had taken. He acknowledged telling the police that he took the Chevrolet Caprice to the Tupelo Apartments, saying that was what Sergeant Miller had told him. He said that the only part of his statement that was true was the part about him helping "Boo" with his tire.

Asked the purpose of his statement, the defendant responded:

-12-

After a long period of time, the reason why I gave the statement is because I was tired, and I would like to forget it. I mean if they're going to give me an auto theft, I can actually beat that. I know I could beat one compared to a murder case or whatever. So, I mean, if they would have gave me that one compared to a murder, I'd jump on that quick.

**Rebuttal Proof**

The prior sworn testimony of Sergeant Tim Sims, who was deceased at the time of this trial, was read into the record. In that testimony, Sergeant Sims said that he and Sergeant Mark Miller interviewed the defendant on September 17 after advising him of his rights and took his written statement. He said that the defendant's second statement was taken later the same day and that Sergeant Fitzpatrick was present for that interview. He explained that they took a second statement from the defendant when it was discovered that some of the information in his first statement was untrue. He said that the defendant did not give them an alibi or say anything about being with his girlfriend. Sergeant Sims said that the defendant did not deny his involvement in the crimes.

## ANALYSIS

We will consider the two issues raised by the defendant on appeal.

### I. 2007 Indictment for Especially Aggravated Robbery

The defendant argues that the trial court erred in refusing to dismiss the 2007 indictment for especially aggravated robbery, which was returned by the grand jury after the defendant's first trial had ended in a hung jury. On appeal, he sets out his precise argument in this regard:

> When the trial court failed to dismiss the untimely indictment of Especially Aggravated Robbery it violated the Defendant's rights protected under three separate laws. The added indictment was untimely and failure to dismiss it violated Tenn. R. Crim. P. 48(b); the additional indictment violated the mandatory joinder of offenses required by Tenn. R. Crim. P. 8(a); and allowing the superseding indictment offended the Defendant's double jeopardy interests. The court's refusal to dismiss the superseding indictment was reversible error.

Before considering this argument, we first will set out the chronology of the defendant's indictments and trials. The first indictment was returned on March 25, 2003, and

his first trial commenced on June 18, 2007. Following a mistrial in that matter, the additional indictment was returned on December 13, 2007, and his second trial began on October 20, 2008.

At the defendant's first trial, on all of the charges except the later returned charge of the especially aggravated robbery of Hussein Altilibwy, jeopardy had attached. However, since that trial ended in a hung jury, jeopardy had not ended. Richardson v. United States, 468 U.S. 317, 326 (1984) ("[W]e reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected."). Thus, we disagree with the defendant's argument that trying him on the especially aggravated robbery indictment returned in 2007 violated his rights against double jeopardy, for he was in continuing jeopardy from his first trial.

As to this issue, the defendant additionally argues that the trial court should have dismissed this indictment pursuant to Tennessee Rule of Criminal Procedure 48(b), which provides that "[t]he court may dismiss an indictment, presentment, information, or complaint if unnecessary delay occurs in: (1) presenting to a grand jury a charge against a defendant who has been held to answer to the trial court; or (2) bringing a defendant to trial."

As this court explained in State v. Dunning, 762 S.W.2d 142, 144 (Tenn. Crim. App. 1988): "In order to achieve dismissal based upon . . . a delay [between the offense and the indictment], the defendant must show that (1) the delay caused substantial prejudice to his rights to a fair trial; and (2) the delay was an intentional device to gain tactical advantage over the accused."

We note that, in the order denying the defendant's motion to dismiss the 2007 indictment, the trial court found that the State had neither "held back" this new charge nor brought it out of prosecutorial vindictiveness.

We agree with the trial court that the defendant has made neither of the showings required by Dunning. In fact, since he was to be retried on the original charges, it is difficult to imagine how he could have been prejudiced or that the State delayed the second indictment, based upon the same incident, to gain a tactical advantage over the defendant. We note, additionally, that the second indictment was returned eleven months before the defendant's second trial began, and it appears that little, if any, additional proof was required by this charge. Accordingly, we conclude that the defendant's argument as to Rule 48(b) is without merit.

The Advisory Commission Comments explain that the intent of Tennessee Rule of Criminal Procedure 8(a) is to prevent "a deliberate and willful 'saving back' of known

-14-

charges for future prosecution":

> This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. . . .
>
> The commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of "saving back" one or more charges arising from the same conduct or from the same criminal episode. Such other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury. "Appropriate prosecuting official" shall be so construed as to achieve the purpose of this rule, which is the prevention of a deliberate and willful "saving back" of known charges for future prosecution. The refusal of the grand jury to act upon such other charges would not be a violation of this joinder rule so as to bar future prosecution of such charges.

Since jeopardy was continuing from the first trial, the return of the 2007 indictment, adding an additional indictment to those upon which he would be tried, did not subject the defendant to the vexation of an additional trial.

As to this issue, we find persuasive this court's decision in State v. Frank Michael Vukelich, No. M1999-00618-CCA-R3-CD, 2001 WL 1044617 (Tenn. Crim. App. Sept. 11, 2001), perm. to appeal denied (Tenn. Apr. 1, 2002), which presented a complicated set of facts.

In Vukelich, the defendant was indicted in January 1998 for one count of conspiracy to deliver marijuana and three counts of money laundering. Id. at *5. In May 1998, the original indictment was dismissed by the trial court and a superseding indictment was returned by the grand jury, charging the defendant with one count of conspiracy to deliver marijuana and six counts of money laundering. In July 1998, a second superseding indictment was returned against the defendant, this time charging him with one count of conspiracy to deliver marijuana, one count of conspiracy to deliver marijuana, and six money laundering offenses. The trial court dismissed the second count of conspiracy to deliver marijuana. Id. The defendant then was tried on the remaining counts, and a hung jury resulted. He was indicted once again, this time for conspiracy to deliver marijuana and eight counts of money laundering, four of which were based upon testimony during the defendant's trial. The trial court granted the State's motion for consolidation of the indictments, meaning that the final charges consisted of count one of the second superseding indictment and counts

-15-

two through nine of the third superseding indictment. Id. At trial, the defendant was found not guilty of one of the money laundering charges, but guilty on all other counts. Following the denial of the motion for a new trial, the court dismissed the four additional money laundering counts, concluding that the addition of those counts violated Rule 8 of the Tennessee Rules of Criminal Procedure. Id. at *6. The State appealed this ruling.

In considering the State's appeal, the court in Vukelich noted that the Tennessee Supreme Court, in State v. Carruthers, 35 S.W.3d 516, 573 (Tenn. 2000), had adopted this court's language as to whether, in an analogous situation, Rule 8 allowed the defendant to be tried on three counts of first degree murder, for which he was indicted before being later indicted for three counts of especially aggravated kidnapping and one count of especially aggravated robbery. Both sets of indictments were returned before the first trial, but at different times, resulted from the same criminal episode, and involved the same victims. The Carruthers court explained why the defendant could be tried on both sets of indictments:

> "[Carruthers'] argument ignores the basic premise behind the Rule. The purpose of Rule 8 is to promote efficient administration of justice and to protect the rights of the accused. The rule clearly permits a subsequently returned indictment to be joined with a previous indictment where the alleged offenses relate to the same criminal episode. This practice, however, does have certain limitations that, as the comments note, safeguard an accused against prosecutorial abuse. For example, a prosecutor cannot simply decide to "save" charges on other offenses arising out of the same conduct until after a trial is had on the original charges. Obviously, this would result in multiple trials and prejudice the defendant. This concern, however, is not present in the case at hand because the subsequent indictments were returned well before the start of trial."

Vukelich, 2001 WL 1044617, at *11 (quoting Carruthers, 35 S.W.3d at 573).

The court in Vukelich further explained the applicability of the holding in Carruthers:

> We believe that Carruthers and King[2] stand for the proposition that the

---

[2]In King v. State, 717 S.W.2d 306, 307 (Tenn. Crim. App. 1986), the defendant was tried for assault with intent to commit murder in the first degree and convicted of malicious stabbing, which was not a lesser-included offense of the indicted offense, resulting in the overturning of the conviction on appeal. The defendant then was indicted for malicious stabbing. Applying Tennessee Rule of Criminal Procedure 8(a), the trial court dismissed the second indictment, which this court affirmed on appeal, because mandatory joinder rules required that this charge be joined with the first indictment. Thus, in King, jeopardy had
(continued...)

purpose of Rule 8 is to prevent multiple trials necessitated by the prosecutor's "holding back" of charges arising out of the same conduct for which other charges have been prosecuted to completion. That evil is not present here, and we respectfully disagree with this Court's holding to the contrary in State v. Luther E. Fowler, [No. 03C01-9207-CR-00249], 1993 WL 278468, at *6-*8 [(Tenn. Crim. App. July 27, 1993)].[3] In the instant case the defendant's first trial ended with a hung jury thereby necessitating a second trial on the original charges whether the new charges were brought, or not. Following a mistrial where a new trial on the original charges will be held in any event, we do not believe Rule 8 is implicated. See, State v. Luther E. Fowler, 1993 WL 278468, at *8 (Peay, J. dissenting); People v. Quigley, 697 N.E.2d 735, 739 (Ill. 1998) (holding that mandatory joinder is not applicable in cases of mistrial). Therefore, it was error for the trial court to dismiss the four money laundering counts in question, and we therefore reverse that decision. Because of this holding we need not address the defendant's argument that the initial inclusion of these counts in the indictment prejudiced him.

Id.

We believe that this court's holding in Fowler is not supported by subsequent case law and, as did the court in Vukelich, decline to follow it.

On appeal, the defendant additionally relies on the holding of this court in State v. David Johnson, No. W1998-00687-CCA-R3-CD, 2001 WL 278093, at *1 (Tenn. Crim. App. Mar. 14, 2001), perm. to appeal denied (Tenn. Oct. 29, 2001), wherein the defendant's trial on a charge of second degree murder ended in a mistrial and the State then reindicted him for first degree premeditated murder and felony murder. This court concluded:

We do not believe that Rule 8 is implicated in the current case, because the

_____

[2](...continued)
attached in the first trial, which concluded with the defendant's being convicted of malicious stabbing. By contrast, in the present appeal, jeopardy was continuing, as the result of the initial mistrial. Accordingly, King is not applicable to the present appeal.

[3]In Fowler, the court held that, even though the defendant's first trial on the charge of assault with intent to commit first degree murder ended in a mistrial, the State could not retry him on that charge as well as on an indictment for aggravated assault, arising from the same incident, the latter indictment being returned after the first trial had ended in a mistrial. In Vukelich, we disagreed with the holding in Fowler and declined to follow it.

state did not attempt to allege "multiple" offenses. It alleged a single offense of homicide. The first indictment merely alleged a lesser-included offense of the greatest offense alleged in the second indictment. The state did not attempt to allege a second offense, as would have been the case, for instance, had it attempted to allege the commission of robbery, the predicate offense that was suggested in the superseding indictment's charge of first degree felony murder.

Id. at *13.

We believe that the court's comments about a "second offense" are observations, rather than a holding. In any event, we do not interpret these comments as instructive when, as in the present appeal, there is no superseding indictment but, rather, the defendant is retried on the same indictment, following his indictment for an additional charge.

As supplemental authority, the defendant has cited the holding of this court in State v. Cedric Johnson, No. W2008-01593-CCA-R3-CD, 2009 WL 4263653, at *4-5 (Tenn. Crim. App. Nov. 30, 2009), perm. to appeal granted (Tenn. May 11, 2010), particularly its review of Fowler. In Johnson, the two related charges against the defendant had taken separate paths through the court system, with one charge resolved by a plea of guilty, while the other charge was still pending. A divided panel of this court held that Rule 8(a) prevented the State from proceeding on the second charge. This case is unlike the situation presented by Johnson, for here, the first indictments still were pending as the second one was returned by the grand jury. As for the holding in Fowler, we previously have stated that we disagree with its holding and, therefore, decline to follow it.

Accordingly, we conclude that Tennessee Rule of Criminal Procedure 8(a) was not a bar to the defendant's being tried on the first indictment, which consisted of multiple counts, with the new indictment for especially aggravated robbery, for jeopardy was continuing from the declaration of the mistrial.

The defendant is not entitled to relief on this issue.

## II. Trial Court's Refusal to Permit Evidence of Guilt of Third Party

The defendant argues that the trial court erred in not allowing him to present, as a witness, a defense investigator to relate to the jury the statement made to him by John Tomason. In the defendant's view, this ruling both deprived him of his right to present evidence of the guilt of a third party and denied his right to compulsory process. The State responds that this testimony was not critical to the defense and that its exclusion did not prejudice the defendant.

The following is the statement of John Tomason given to Investigator Clark Chapman of Eyewitness Investigations, Inc.:

[Tomason] stated, "I can tell you exactly what happened and I wasn't involved, but I was around and heard the gunshots." [Tomason] stated, "Myron, [Devin Banks] and myself would steal cars for the Iranians and they would re-title the cars and sell them or claim insurance on them. The Iranians began to not pay [Banks] for the cars so [Banks] was becoming upset with them as the Iranians promised to pay." On Sunday morning [Banks] had come over to [Tomason's] house to go to church and [Banks] asked [Tomason] if he could borrow his [Tomason] gun for protection. [Tomason] loaned [Banks] his 9 mm pistol. That night [Banks] brought a Bronco to [Tomason's] house that was stolen, but not yet re-titled by the Iranians. [Tomason] located a rusty [.25] caliber pistol in the console of the vehicle and gave it to [Banks]. That night [Banks] and Myron informed [Tomason] they were going to go and confront the Iranians about their share of the money from the stolen vehicles and asked [Tomason] if he wanted to go. [Tomason's] mother Sherry was at home and didn't know [Tomason] had left the house. ([Tomason] stated, "You know how kids jump out of their window at night.") They then walked to the Iranians['] house and [Banks] and Myron went inside and [Tomason] continued to walk up and down the road when he heard gunshots. [Tomason] ran to the house thinking his friends had been shot and as he approached the house, the Iranian was lying outside and had been shot. [Tomason] stated, ["]The Iranian looked at me and I got scared and ran toward my house and Myron and [Banks] caught up with me and told me not to say anything to anybody and they would give me a carton [o]f cigarettes in the morning and drive me to school."

The next morning [Banks] arrived at [Tomason's] house in the victim's red Jeep and drove [Tomason] to school and he did give [Tomason] the cigarettes. [Tomason] was very nervous to be riding in the victim's Jeep to school when the victim's house was near the school. [Tomason] replied, "Myron is a mixed looking guy with a scar over his eye. One of his parents is Caucasian and the other is African American." [Tomason] replied, "You aren't just telling me this to get . . . me to tell what happened?" I stated, "No, I was actually told this." [Tomason] replied, "I can't believe [Banks] has been mentioning my name, I didn't think he would do that to me." I then asked was [the defendant] at the scene of the crime that night and [Tomason] replied, "No, I did not see him." [Tomason] stated, "I am only telling you this because [Banks] has mentioned my name and I wouldn't have told on them if they

-19-

would not have put my name in it."

[Tomason] wanted to make it clear he only walked with Dev[i]n [Banks] and Myron to the victim's house and he continued to walk the streets near the house waiting on [Banks] and Myron. [Tomason] had no knowledge any violence was going to take place.

During the second trial, the court conducted a hearing outside of the presence of the jury to determine whether Tomason, who was represented by counsel, would testify. When asked if he would respond to questions regarding his knowledge of the crimes, he told the court, "I wish to plead the fifth. The question you asked, I plead the fifth. I plead the fifth." Tomason's counsel told the court that his client was "invoking the fifth amendment for any questions involving this homicide on this particular date." Tomason then was excused from the courtroom.

On appeal, the defendant sets out what, in his view, would have been established by the statement of John Tomason:

(1) he was present when the crime occurred, (2) he witnessed the crime, (3) he could identify the persons responsible, (4) he could establish time, (5) he established a motive not related to the defendant, (6) established why the living victim thought that the second person involved was white, (7) corroborated what his mother testified about, and (7) [sic] exculpated the [d]efendant, whom he knew, from being involved.

We now will consider the defendant's claim that the court erred in excluding the statement made by Tomason to the defendant's investigator.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion. Id.

We will review the cases relied upon by the defendant as to this issue.

The defendant first cites Chambers v. Mississippi, 410 U.S. 284 (1973), to argue that

-20-

his due process rights to present a full and complete defense required the admission of Tomason's statement," which, he asserts, was against his penal interest. The State responds by arguing that Chambers is distinguishable on its facts and therefore inapplicable to the case at bar. We agree with the State.

The defendant in Chambers was charged with the murder of a police officer in Mississippi. 410 U.S. at 287. As part of his trial defense strategy, he attempted to show that the killing had instead been committed by a man named McDonald, who had given a sworn statement confessing the murder to Chambers' attorneys. Id. McDonald's sworn confession was admitted at trial, but McDonald himself testified that he was innocent of the crime and had repudiated the confession. Id. at 291. He also offered an alibi for the night in question. Id. Chambers then sought to introduce the testimony of three of McDonald's friends, each of whom had heard McDonald confess to the killing. However, he was prevented from doing so in each case by the operation of Mississippi's rule against hearsay. Id. at 292-93. In reversing the conviction, the Supreme Court concluded that the exclusion of the hearsay testimony, which was critical to Chambers' defense, coupled with the State's refusal to allow defense counsel to cross-examine McDonald regarding the repudiation of his confession, denied Chambers "a trial in accord with traditional and fundamental standards of due process." Id. at 302.

On appeal, the State argues that crucial to the Court's decision in Chambers was that the hearsay statements the defense sought to introduce in that case carried certain indicia of reliability that do not exist in the present case. The analysis in Chambers sets out why the particular hearsay statements were reliable:

> The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case . . . . Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. . . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.

Id. at 300-01 (citations and footnote omitted).

As we will explain, the matters tending to show the reliability of the hearsay statement in Chambers are not present in the present appeal. Likewise, we do not find to be relevant the holding in Holmes v. South Carolina, 547 U.S. 319 (2006), for in that case, the issue was the legality of a rule which provided that the defendant could not present evidence of third party guilt if the State had produced forensic evidence which, if believed, strongly supported the guilt of the defendant. Such a situation is not present here.

In State v. Flood, 219 S.W.3d 307 (Tenn. 2007), the defendant was charged with four counts of rape of a child. Following his conviction, he raised on appeal the claim that the trial court violated his right to raise a defense by excluding testimony from the victim's father that she told him the defendant had made her touch his penis and later then asked her father if the defendant still would have to go to jail if someone else were caught. The defendant argued that the first statement showed that he did not orally penetrate the victim. Id. at 313-14.

In determining whether excluding these statements, on evidentiary grounds, violated the defendant's right to present a defense, the court set out the applicable legal principles:

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000).

Id. at 315-16.

The court then repeated the three-part test, set out in Brown, for determining whether exclusion of the evidence rose to the level of a constitutional violation:

(1) Whether the excluded evidence is critical to the defense;

(2) Whether the evidence bears sufficient indicia of reliability; and

(3) Whether the interest supporting exclusion of the evidence is substantially important.

Id. at 316 (citing Brown, 29 S.W.3d at 434-35).

Applying these considerations, the court determined that the excluded testimony was of little, if any, probative value and, thus, not critical to the defense, for its exclusion did not undermine elements of the defense. Id. at 316-17. Additionally, as to the indicia of reliability of the statements, the court noted that, although the statements were made by the victim to her father, in confidence and at a time when she had no reason to be dishonest, they were of little probative value because they neither implicated another nor rebutted the victim's testimony that the defendant had penetrated her. Id. at 318. Finally, the court concluded that the reasons for the exclusion of evidence of Tennessee Rules of Evidence 802 and 613(b) had not been overcome, for the defendant had not cross-examined the victim herself about the statements, thus giving her the chance to explain them and that presenting in the fashion he chose, through the cross-examination of the victim's father, was not an orderly way to introduce the evidence. Id. at 319.

In Brown, 29 S.W.3d at 429, an emergency room physician, testifying on behalf of the State, said that he "observed a tear in the complainant's hymen which he attributed to forced penetration." Thus, the issue before the court was "whether the trial court correctly applied the rape shield rule in excluding testimony about a rape complainant's prior sexual behavior with a person other than the defendant." Id. at 428.

To get before the jury an alternative explanation for the tear, the defendant sought to present evidence of the victim's prior sexual activity. Id. The court detailed the testimony which the defendant sought to introduce:

> Brown sought to introduce the testimony of A.L. and E.G. The trial court heard the testimony of both witnesses out of the jury's presence. A. L., age eighteen at trial, testified that she observed W.S., an adolescent male, and the complainant engaging in kissing and fondling. E.G., age fifteen at trial, testified that she also observed W.S. and the complainant kissing and fondling. Additionally, E.G. stated that the complainant had mentioned to her "a couple of times" that she had been having sex with W.S.

Id. at 431.

In assessing whether the trial court had erred by not allowing this testimony, our supreme court first found that the defendant's purpose for seeking the admission of this evidence fit with Tennessee Rule of Evidence 412(c)(4)(i) and that its probative value outweighed any unfair prejudice to the victim. Although the evidence remained inadmissible hearsay under Tennessee Rule of Evidence 801(c), the defendant argued that excluding this

-23-

evidence violated his constitutional right to present a defense.

In applying the applicable considerations, the court concluded that the hearsay testimony was critical to the defense; that the evidence was reliable, both of the witnesses being friends of the victim around the time of the incident; and that the State's interest in enforcing the hearsay rule was "substantially less than Brown's compelling interest in presenting the evidence." Brown, 29 S.W.3d at 435. Accordingly, the court concluded that the evidence should have been admitted.

Applying these considerations to the present case, it first is clear that the excluded evidence was critical to the defense. If believed, the statement would have established that a person other than the defendant was involved in the crimes.

Next, we will consider the indicia of reliability of the statements. The record on appeal includes the testimony from the first trial of the defense investigator, who related what he had been told by John Tomason, who claimed to have witnessed the incident and stated that the defendant was not present.[4] The record reveals very little about Tomason. According to Clark Chapman, his first two interviews occurred while Tomason was confined for robbery charges and the third interview while he also was confined, although the record does not reveal on what charges. The interviews with Tomason occurred in 2006, approximately four years after the incident which resulted in the defendant's arrest. Chapman acknowledged that Tomason said he had "mental health issues" and had been off his medication at the time of the commission of his own offenses.

The record on appeal does not reveal that Tomason was asked anything about his background, work history, or relationship with the defendant. We note that, although Tomason told Chapman that the defendant was not present when the incident occurred, he was not shown a photograph of the defendant to make certain that he was talking of the defendant or of another. Thus, as to whether the statement of Tomason to Chapman "bears sufficient indicia of reliability," all the record on appeal shows is that a jail inmate named John Tomason, who had "mental health issues," said that the person whom he knew as Michael Hilliard was not present when a crime was committed four years earlier. These facts contrast sharply with those of Chambers, Brown, and Flood where the courts found substantial indicia of reliability of the hearsay statements. Accordingly, we cannot conclude that the hearsay testimony of Tomason bears a sufficient indicia of reliability to be admissible.

Finally, we consider whether the interest supporting the exclusion of the hearsay

_____

[4]In the first trial, the investigator was allowed to testify as to John Tomason's statement. However, the trial court did not allow this testimony during the second trial.

testimony is important, and, as we will explain, we conclude that it is.

Tennessee Law of Evidence § 8.01 sets out the four main risks of hearsay: (1) that "the declarant's sincerity cannot be assessed"; (2) that "the trier of fact may find it hard to discover whether there was some ambiguity in the declarant's original statement"; (3) that "the declarant's memory cannot be tested by cross-examination;" and (4) that "the declarant's perception may have been faulty." Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[3][b] (5th ed. 2005).

Applying these factors to the present appeal, it is clear that the rule against the admission of hearsay must prevail. First, the jury would have no information about either the declarant other than he was in jail at the time of the statement, his relationship with the defendant, or what medication he was taking and why. Second, since the declarant was not shown a photograph of the defendant, the jury could not have known whether the "Michael Hilliard" he said was not at the scene was the same person who was on trial. Additionally, Tomason was not available for cross-examination to test his memory and perception. This is an important consideration, given Tomason's periods of incarceration, his undetailed "mental health issues," and the fact that his statements were taken four years after the crimes. Given this, we conclude that the rationale for the rule against the admission of hearsay statements trumps the defendant's interest in getting this statement before the jury. Accordingly, as to this claim, the trial court did not abuse its discretion in refusing to allow testimony as to the hearsay statement.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE